UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
                                      :
SHIXU BAI,                            :
                                      :
                       Plaintiff,     :       20cv4942 (DLC)
            -v-                       :
                                      :       OPINION AND ORDER
TEGS MANAGEMENT, LLC et al.,          :
                                      :
                       Defendants.    :
                                      :
------------------------------------- X

APPEARANCES:

For plaintiff Shixu Bai:
Jessica Kordas
Joshua Fuld Nessen
The Maddox Law Firm
125 Elm Street
New Canaan, CT 06840

For defendants Tegs Management, LLC and Grand Market
International Corp.:
Arthur Marc Rosenberg
Dana Michelle Susman
Kane Kessler, P.C.
David Abraham Gold
600 Third Avenue, Ste 35th Floor
New York, NY 10016

For defendants Serge Bauer, P.C. and Serge Bauer:
Gregg Douglas Weinstock
Karolina Maria Wiaderna
Morgan Taylor Gieser
Vigorito, Barker, Patterson, Nichols & Porter LLP
300 Garden City Plaza, Ste 100
Garden City, NY 11530

DENISE COTE, District Judge:

    Shixu Bai, a citizen of China, made a $1 million investment

in 2013 in a specialty grocery store business in New York in an

effort to obtain a visa through the EB-5 Immigrant Investor Program (the "EB-5 Program").  He contends that his attorney and participants in that business (the "Defendants") defrauded him. The Defendants have moved to dismiss this action.  The motion is granted on the ground that the action is time-barred.

## Background

The following facts are derived from the third amended complaint ("TAC") and are assumed to be true for the purposes of this motion unless otherwise stated.

I.   The EB-5 Program

An overview of the EB-5 Program, also known as the Immigrant Investor Program, is helpful to understanding Bai's allegations.  U.S. Citizenship and Immigration Service ("USCIS"), an agency within the Department of Homeland Security, processes requests for immigration benefits.  Its EB-5 Program permits noncitizens to apply for permanent residence in the United States -- colloquially, a green card -- by investing at least $1 million in a new commercial enterprise, or a reduced amount of $500,000 if the investment is made in a Targeted Employment Area.[1]  8 U.S.C. § 1153(b)(5).  In order to obtain an EB-5 investor visa, a petitioner files a Form I-526 Immigrant

---

[1] USCIS, EB-5 Immigrant Investor Program (last updated Dec. 30, 2021), https://www.uscis.gov/working-in-the-united-states/permanent-workers/eb-5-immigrant-investor-program.

Petition by Alien Entrepreneur ("I-526 Petition") with USCIS. The I-526 Petition must be supported with evidence that (1) the petitioner is the legal owner of the capital that is invested and that he did not acquire it by unlawful means, 8 C.F.R. § 204.6(e); (2) the investment created or will create at least ten full-time jobs for qualifying employees, 8 U.S.C. § 1153(b)(5)(A)(ii); and (3) the petitioner's investment was "at risk," 8 C.F.R. § 204.6(j)(2).[2]

The applicable regulations on qualifying investments require evidence that the "petitioner has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk." Id.  Since 1998, the agency has held that a redemption agreement entered into at the time of an investment "evidences a preconceived intent to unburden oneself of the investment as soon as possible after unconditional permanent resident status is attained" and therefore the investment is not at risk for the purposes of EB-5 eligibility. Matter of Izummi, 22 I&N Dec. 169, 186-88 (1998).

---

[2] USCIS, Policy Manual (last updated Feb. 8, 2022), EB-5 https://www.uscis.gov/policy-manual/volume-6-part-g-chapter-2; USCIS, EB-5 Investors (last updated January 9, 2020), https://www.uscis.gov/working-in-the-united-states/permanent-workers/employment-based-immigration-fifth-preference-eb-5/eb-5-investors.

If USCIS approves the I-526 Petition (and an application to adjust immigrant status), the investor is granted conditional permanent residence in the United States.  A Form I-829 Petition by Investor to Remove Conditions on Permanent Resident Status ("I-829 Petition") requires a showing that the investor and commercial enterprise have complied with the EB-5 Program requirements.[3]

II.  The 2013 Tegs Investment

Bai, who speaks only Mandarin, wanted to obtain an EB-5 immigrant investor visa.  Bai used a $1 million gift from his son-in-law, Aleksey Petrov, in order to obtain the visa.  Petrov had received $10 million as a gift from his own father, a Russian citizen and former elected official of the Parliament of the Russian Federation.  Petrov gave $1 million of his father's gift to his wife in 2012, who then gave the $1 million to her father, Bai.

Petrov also introduced Bai to defendant Serge Bauer, an immigration attorney and the founder of defendant Serge Bauer, P.C., a Washington, D.C.-based law firm that specializes in

---

[3] USCIS, EB-5 Investors (last updated January 9, 2020),
https://www.uscis.gov/working-in-the-united-states/permanent-
workers/employment-based-immigration-fifth-preference-eb-5/eb-5-
investors.

providing EB-5 visa services.[4]  In 2012, Bauer identified one of his existing clients, defendant Grand Market International Corp. ("GMI"), as a potentially qualifying investment opportunity that could support EB-5 investor visa petitions for Bai and Petrov. GMI is a closely-held company based in Brooklyn, New York that operates a chain of Eastern European specialty grocery stores under the brand name NetCost Market.  In 2012, GMI's owners established defendant Tegs Management, LLC ("Tegs") to own and operate a new NetCost Market store to be named Gourmanoff.[5]  In December 2012, Bai and Petrov toured an existing NetCost Market store.

In 2013, Bai invested in Gourmanoff.  On May 31, 2013, Bai and Petrov met in Queens, New York with Bauer and GMI's Chief Financial Officer and Tegs' Managing Member.  There they signed an 18-page document titled the Tegs Operating Agreement (the "2013 Operating Agreement").  The 2013 Operating Agreement provided that Bai and Petrov, identified as EB-5 Members, would receive Class B units comprising 7% equity in exchange for capital contributions of $1 million each.  Section 6.2(c)-(d) of

---

[4] Bauer's firm had previously advised Petrov with respect to two unsuccessful I-526 Petitions.  Petrov received a refund of both underlying investments.

[5] GMI and Tegs share the same owners and executives, many of whom are family members.  GMI is not itself a Tegs shareholder.

the Operating Agreement, the Redemption Clause, is significant

in the discussion that follows.  It provided that:

> (c)  In the event either Member's I-526 investor visa
> petition is not approved and/or they fail to receive
> their immigrant visas at the US consulate, the Company
> intends to refund that Member's $1,000,000
> subscription amount paid within 180 days if feasible
> or the Company may replace the Member.

> (d)  In the event of the denial of the I-829 Petition
> . . . following the USCIS's Request for Evidence in
> connection with their I-829 petition, the Company
> intends to refund that Member's $1,000,000
> subscription amount paid within 120 days if feasible.

(Emphasis supplied.)

On August 1, 2013, Bai met with Bauer in Buffalo, New York,

and executed three documents (together, the "Investment

Agreements"):[6] (1) the Business Plan of Tegs Management, LLC

d/b/a Gourmanoff (the "Business Plan"); (2) the Confidential

Private Offering Memorandum (the "Prospectus"; and (3) the

Subscription Documents, including the Subscription Agreement

(the "Subscription Agreement").  The 36-page Business Plan

projected that the Gourmanoff store would open in Brighton

Beach, Brooklyn on December 14, 2013, and hire approximately 75

employees.  The 18-page Subscription Agreement provided that

---

[6] The TAC alleges that the Defendants failed to produce a
Mandarin interpreter during any communication with Bai, and that
he never received translations of the Investment Agreements.
The TAC also states, however, that Bai communicated with GMI and
Tegs through his daughter and Petrov.

"[t]he Investor acknowledges that, in making a decision to subscribe for the Interests, it has relied solely upon" the 2013 Operating Agreement, the Subscription Agreement, and "independent investigations made by the Investor."  The Subscription Agreement included the Redemption Clause from the 2013 Operating Agreement.

In the 59-page Prospectus, Tegs repeatedly and expressly disclaimed any guarantee that an immigrant investor would be able to obtain conditional or permanent resident status in the United States.  For example, in a subsection titled The EB-5 Program, bolded and italicized text read: "[t]here can be no assurance that an I-526 Petition will be approved, that an Investing Member will successfully complete the Visa Process, or that upon approval thereof that the conditions attaching thereto will be removed."  And in a subsection titled Risk Factors, which again set forth the risks of the EB-5 Program and warned investors of their independent obligations to pursue a visa, Tegs represented that it

> believes that an investment in the Interests will place an Investor's investment in the Company at risk, because as described herein there is no assurance that the business of the Company will be able to return any Investor's investment in the Interests at any time, if ever.  However, purchase of an Interest does not guarantee conditional or permanent residency in the United States.

On August 2, 2013, Bai wired $1 million to the Tegs escrow account.  On August 5, Bai signed a one-page letter from Bauer which explained that Bauer represented both Bai and GMI and its subsidiaries and would receive a transaction fee.[7]  By signing the letter, Bai acknowledged and waived in writing any conflict of interest and permitted Bauer to proceed with preparing his EB-5 application.

Gourmanoff did not open in December 2013.  The parties dispute the actual opening date of the store.[8]  The TAC asserts that the store opened in 2019.  The parties agree that by the time this action was filed in 2020, Tegs had opened the Brighton Beach store identified in the Business Plan.  Bai remains a member of Tegs and continues to hold a 7% interest in it.

III. The 2013 and 2015 EB-5 Visa Petitions

Bauer's firm prepared and filed Bai's I-526 Petition on October 29, 2013.  The cover letter quoted the Redemption Clause

---

[7] The TAC describes the letter as "allegedly signed" by Bai.  The TAC does not assert, however, that Bai did not sign the Bauer letter.  Since Bai would know whether the signature was his, this Opinion proceeds on the assumption that Bai signed the letter.  Notably, Bai does not contend that he was unaware that Bauer also represented Tegs and GMI.

[8] The TAC alleges that the store did not open until August 25, 2019 even though GMI opened four other stores between 2015 and 2018.  The TAC describes Bai, however, receiving disbursements that were styled as returns on his investment from the operation of the store between 2015 and 2019.  Bauer asserts that the store in fact opened in 2014.

of the 2013 Operating Agreement and argued that Bai was not guaranteed repayment of his investment.

On September 8, 2015, USCIS issued a Notice of Intent to deny Bai's I-526 Petition.  USCIS cited three reasons for determining that Bai was ineligible for an EB-5 visa: (1) doubts that the requisite ten jobs would be or had been created; (2) "the risk-free nature of the investment" due to the Redemption Clause; and (3) "concerns that the invested capital was not lawfully obtained."  Bai appealed to the Administrative Appeals Office ("AAO"), which affirmed the decision on July 27, 2016.  The AAO agreed that the Redemption Clause meant that Bai's investment was not fully at risk.[9]

Bauer advised Bai to agree to an amendment of the 2013 Operating Agreement in order to cure the deficiency linked to the Redemption Clause.  At a Special Meeting on September 21, 2015, with Bai's agreement, the 2013 Operating Agreement was amended to replace the Redemption Clause in § 6.2 with a term stating that "no Member had the right to withdraw or reduce his contribution to the capital of the Company until the termination of the Company."  A new section titled Investment at Risk read:

---

[9] The AAO held that the Redemption Clause reflected that Bai and Tegs had effectively entered into a prohibited debt agreement under the applicable EB-5 regulations on qualifying investments. See, e.g., 8 C.F.R. § 204.6(e), (j); Izummi, 22 I&N Dec. at 188.

Notwithstanding anything in this Agreement, the LLC
can make <u>no guarantees</u> to any Member that he or she
will receive any return on his or her investment
capital.  Additionally, the Company and the Managing
Member retain the right to modify this Agreement to
establish or maintain compliance with the EB-5
Investor Program as adjudicated by [USCIS].

On September 30, 2015, Bauer's firm filed a new I-526
Petition on Bai's behalf.  USCIS issued a Request for Evidence
("RFE") on May 10, 2019, to determine whether Bai had redeemed
any funds during the two-year period when the Redemption Clause
had been in effect.  Bauer's firm submitted responsive materials
on August 8.

USCIS denied the second petition on September 24.  The
agency cited the same three reasons for its determination that
Bai was not eligible for an EB-5 visa.  It restated its doubts
that the capital investment had been lawfully obtained and that
ten qualifying jobs had been created as a result of the
investment.  USCIS also explained that Bai had failed to produce
evidence in response to the RFE that demonstrated that he had
not redeemed his investment between 2013 and 2015.

On October 7, Bauer's firm gave Bai an eight-page
memorandum that recommended appealing USCIS' denial, summarized
the issues to be covered, predicted an eventually favorable
outcome in federal court, and advised that any Notice to Appeal
must be filed by October 26.  On October 16, Bai declined to
proceed and sought withdrawal of his $1 million investment in

Tegs.  Within a week, however, he reversed course upon Bauer's advice.[10]  On October 22, Bauer's firm filed a "bare bones" Notice of Appeal, without a supporting legal brief.

In Fall 2019, Bai retained new counsel.  In response to a demand letter from Bai's new law firm, Bauer explained to Bai and Petrov on May 21 that the source of their investment funds was an insurmountable problem for their EB-5 applications and recommended consulting another immigration attorney for a second opinion.  In another memorandum dated June 8, Bauer explained that another immigration attorney advised that the main issue with Bai's EB-5 application was the source of Bai's funds, and stated that "it is not possible for any immigration attorney to obtain approval for Mr. Bai's I-526 investor visa application."[11] Bai filed this action later that month, after which Bai withdrew the appeal of his I-526 Petition.

---

[10] Bai characterizes Bauer as "strong-arming" him into consenting to an appeal and cites the memorandum as a component of that coercion.

[11] Bauer noted in the memorandum that Petrov's father, who had provided the funds that Bai used to invest in Tegs, had been recently indicted in Russia for money laundering and tax evasion.  He asserted that USCIS would not be persuaded of the lawfulness of the source of Bai's funds until the indictment was resolved.

IV.  Procedural History

Bai filed this action on June 28, 2020, and GMI and Tegs moved to dismiss the complaint on October 5.  Bai was granted leave to amend and on December 1 filed the First Amended Complaint.  GMI and Tegs renewed their motion on January 29, 2021, and Bauer filed a separate motion to dismiss on the same date.  Bai filed a Second Amended Complaint on March 22, and GMI, Tegs, and Bauer renewed their motions on April 23.  On May 7, Bai was granted a final opportunity to amend the complaint. The TAC was filed on June 8, and on July 22, GMI, Tegs, and Bauer renewed their motions.[12]  The parties were permitted to file sur-replies, and the motions became fully submitted on October 19.  This action was reassigned to this Court on December 10.

## **Discussion**

The TAC alleges three causes of action: (1) that the Defendants violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; (2) that six Individual Defendants violated § 20(a)

---

[12] Bai has also sued six individual owners of GMI and Tegs (the "Individual Defendants").  The six Individual Defendants were served on September 8 and 9, 2021.  An Order of September 15 stayed the Individual Defendants' time to answer or move with respect to the TAC until 30 days following the resolution of the instant motions.

of the Exchange Act, 15 U.S.C. § 78t(a); and (3) common law fraud under New York law.[13]  Before addressing the Defendants' arguments that Bai's federal claims are time-barred, Bauer's motion pursuant to Rule 8(a) will be discussed.

I.   Fed. R. Civ. P. 8(a)

Bauer has moved to dismiss the 90-page TAC pursuant to Rule 8(a), Fed. R. Civ. P., because it is verbose, repetitive, and engages in improper legal argument.  This challenge is understandably raised but must be denied.

Under Rule 8, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "The statement should be short because unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage."  Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citation omitted).  When a complaint does not comply with Rule 8, "the court has the power . . . to dismiss the complaint."  Harnage v. Lightner, 916 F.3d 138, 141 (2d Cir. 2019) (citation omitted).  The Second Circuit has nonetheless

---

[13] The TAC also brought claims alleging violations of §§ 12(a)(1), 12(a)(2), and 29(b) of the Exchange Act, 15 U.S.C. §§ 77d, 77e, 77l, 78cc(b).  The plaintiff withdrew those claims on September 7, 2021.

made clear that dismissal "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. (citation omitted).

The TAC is overly long and disorganized.  It engages extensively in legal argument.  Nonetheless, its claims are discernable.  Accordingly, the TAC does not fail to "disclose sufficient information to permit the defendant to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery." Id. (citation omitted).

## II.  Federal Securities Fraud

The Defendants argue that Bai's federal securities fraud claims are time-barred by the Exchange Act's statute of limitations and statute of repose, and that the TAC in any event fails to state a claim.  The claims are dismissed as untimely. Bai has failed to allege any fraudulent statements or acts in violation of the Exchange Act occurring within the five years prior to the date he filed this action.

### A.   Section 10(b) and SEC Rule 10b-5

"Investments in EB-5 projects are subject to the federal securities laws." Liu v. SEC, 140 S. Ct. 1936, 1941 (2020). SEC Rule 10b-5 renders it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary

14

in order to make the statements made, in light of the
circumstances under which they were made, not misleading . . .
in connection with the purchase or sale of any security."  17
C.F.R. § 240.10b-5; see also 15 U.S.C. § 78j(b).  "Section 20(a)
of the Exchange Act imposes derivative liability on parties
controlling persons who commit Exchange Act violations."  In re
Vivendi, S.A. Sec. Litig., 838 F.3d 223, 238 n.6 (2d Cir. 2016)
(citation omitted).

     To avoid dismissal under Rule 10b-5, a complaint must
plausibly allege that the defendant "(1) made misstatements or
omissions of material fact, (2) with scienter, (3) in connection
with the purchase or sale of securities, (4) upon which the
plaintiff relied, and (5) that the plaintiff's reliance was the
proximate cause of its injury."  Altimeo Asset Mgmt. v. Qihoo
360 Tech. Co., 19 F.4th 145, 149-50 (2d Cir. 2021) (citation
omitted).  A complaint alleging securities fraud must satisfy
the heightened pleading requirements of the Private Securities
Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3), and
Fed. R. Civ. P. 9(b) by stating "with particularity the
circumstances constituting fraud."  Id. at 150 (citation
omitted).

     A species of securities fraud known as scheme liability
prohibits not only misstatements and omissions but also
"manipulative acts."  Set Cap. LLC v. Credit Suisse Grp. AG, 996

F.3d 64, 76 (2d Cir. 2021) (citation omitted).  Rule 10b-5 reads

in full:

> It shall be unlawful for any person, directly or
> indirectly, by the use of any means or instrumentality
> of interstate commerce, or of the mails or of any
> national securities exchange,
>
> (a) To employ any device, scheme, or artifice to
> defraud,
>
> (b) To make any untrue statement of a material fact or
> to omit to state a material fact necessary in order to
> make the statements made, in the light of the
> circumstances under which they were made, not
> misleading, or
>
> (c) To engage in any act, practice, or course of
> business which operates or would operate as a fraud or
> deceit upon any person,
>
> in connection with the purchase or sale of any
> security.

17 C.F.R. § 240.10b-5.

Rule 10b-5(a) or (c) may give rise to liability for conduct

that is deceptive, but which is not itself "a specific oral or

written statement."  United States v. Finnerty, 533 F.3d 143,

148 (2d Cir. 2008) (citation omitted).  In Lorenzo v. SEC, 139

S. Ct. 1094, 1101-02 (2019), the Supreme Court explained that

Rule 10b-5(a) and (c) "capture a wide range of conduct," and

held that a disseminator of misstatements could be primarily

liable for securities fraud under those subsections even if he

did not make the fraudulent statements himself.

16

"To state a scheme liability claim, a plaintiff must show: (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S, 11 F.4th 90, 105 (2d Cir. 2021) ("Plumber") (citation omitted). A plaintiff must specify "what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." Id. (citation omitted).

Rule 10b-5 does not apply to frauds that are not made "in connection with the purchase or sale of securities." This requirement is broad, and "it is enough that the fraud alleged coincide with a securities transaction." Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 85 (2006) (citation omitted). The Exchange Act, however, "must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)." SEC v. Zandford, 535 U.S. 813, 820 (2002). "Typically, a plaintiff satisfies the 'in connection with' requirement when the fraud alleged is that the plaintiff bought or sold a security in reliance on misrepresentations as to its value." Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 96 (2d Cir. 2018) (citation omitted). "A claim fails where the plaintiff does not

17

allege that [a defendant] misled him concerning the value of the securities he sold or the consideration he received in return." Id. (citation omitted).  In addition, a "fraudulent misrepresentation or omission is not made in connection with such a purchase or sale of a covered security unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a covered security." Chadbourne & Parke LLP v. Troice, 571 U.S. 377, 387 (2014). Thus, to succeed, even a scheme liability claim "must have occurred in connection with the purchase or sale of a security." Plumber, 11 F.4th at 105.

     B.   Statutory Time Bar

A district court may consider timeliness on a motion to dismiss "[w]here the dates in a complaint show that an action is barred by a statute of limitations."  Cangemi v. United States, 13 F.4th 115, 134 (2d Cir. 2021) (citation omitted).

> [A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws may be brought not later than the earlier of (1) 2 years after the discovery of facts constituting the violation; or (2) 5 years after such violation.

28 U.S.C. § 1658(b) (emphasis added); see also Steginsky v. Xcelera Inc., 741 F.3d 365, 369 (2d Cir. 2014).  Courts often refer to the former period as a "statute of limitations" and the latter period as a "statute of repose."  See SRM Glob. Master

Fund Ltd. P'ship v. Bear Stearns Companies L.L.C., 829 F.3d 173, 176 (2d Cir. 2016) ("SRM"); P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 104 (2d Cir. 2004).

> The Second Circuit has explained that

> [s]tatutes of repose and statutes of limitations are often confused but nonetheless distinct. A statute of repose creates a substantive right in those protected to be free from liability after a legislatively-determined period of time, regardless of the plaintiff's actions and equitable considerations. A statute of limitations is intended to prevent plaintiffs from unfairly surprising defendants by sleeping on and then later resurrecting stale claims.

Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc., 873 F.3d 85, 110 n.25 (2d Cir. 2017) (citation omitted). The practical consequences of this distinction are significant. Statutes of repose "are subject only to legislatively created exceptions," SRM, 829 F.3d at 176, and "may not be tolled, even in cases of extraordinary circumstances beyond a plaintiff's control." CTS Corp. v. Waldburger, 573 U.S. 1, 9 (2014). "A statute of repose begins to run without interruption once the necessary triggering event has occurred, even if . . . the plaintiff has not yet, or could not yet have, discovered that she has a cause of action." Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc., 721 F.3d 95, 107 (2d Cir. 2013) (citation omitted).

C.   Application of the Statute of Repose

This action was filed on June 28, 2020.  Thus, in accordance with § 1658(b), Bai may only bring suit for alleged violations of the Exchange Act that occurred on or after June 28, 2015.  Here, the only fraudulent statements or omissions alleged in the TAC that were also connected to the purchase or sale of a security were statements and omissions that occurred on or before August 1, 2013.  That is the date on which Bai executed the Investment Agreements and purchased a 7% interest in Tegs.  This action was not commenced for another seven years or nearly two years after the date on which the five-year statute of repose had run.  Because the TAC has failed to allege a misrepresentation or material omission by GMI, Tegs, or Bauer in connection with the purchase or sale of securities that accrued within five years of the filing of this action, Bai's federal securities fraud claims are time-barred.

To escape the operation of the statute of repose, Bai asserts that the TAC alleges a fraudulent scheme pursuant to Rule 10b-5(a) and (c),[14] and therefore the statute of repose did not begin to run until the Defendants' last deceptive act pursuant to that scheme, which occurred in 2019.  Specifically,

---

[14] The TAC does not cite Rule 10b-5(a) or (c), instead only citing 10b-5(b).

Bai argues that Bauer, GMI, Tegs, and the Individual Defendants engaged in a complex scheme between 2013 and 2019 to obtain and then retain Bai's investment by (1) including the Redemption Clause in the Investment Agreements knowing that the inclusion would sabotage his eligibility for an EB-5 visa; (2) using his investment to fund the opening of other NetCost Market stores, but not Gourmanoff; and (3) encouraging futile applications to USCIS over the next six years.  Bai asserts that his lengthy pursuit of an effort to obtain a green card allowed the Defendants to retain his $1 million investment and prevented him from obtaining its repayment.[15]

The only purchase of a security by Bai occurred in 2013. The scheme alleged by Bai does not alter the determination that his causes of action under the Exchange Act also accrued in 2013.  The inclusion of the Redemption Clause in the Investment Agreements occurred in 2013 and therefore this element of the alleged scheme has no impact on the accrual date.  The Defendants' misuse of Bai's 2013 investment to further their own interests does not operate to extend the 2013 accrual date.  Nor do the Defendants' efforts over the years to encourage Bai in his pursuit of the visa.

---

[15] Bai's suggestion that he had a right to the return of his investment in the event his visa was not approved confirms the USCIS determination that Bai's investment was not truly at risk.

The TAC essentially alleges that the Defendants deceived Bai in 2013 and failed to advise him how USCIS would treat the Redemption Clause, specifically, that its inclusion would result in a denial of his I-526 Petitions.  This material omission is alleged to have rendered the 2013 Operating Agreement and Subscription Agreement fraudulent and the Defendants' sale of securities to Bai in 2013 a violation of the Exchange Act.  The Defendants' continued silence for years about the risks associated with the inclusion of the Redemption Clause in the documents through which Bai purchased securities in 2013 does not operate to extend the statute of repose.

Bai has failed to allege a fraudulent statement, omission, or act by any of the Defendants that could constitute a violation of § 10(b) and Rule 10b-5 within the five year period prior to the filing of this action.  Bai's securities fraud claim under § 10(b) of the Exchange Act is accordingly time-barred.  As Bai's claim grounded in § 20(a) is derivative of his § 10(b) claim, it too must be dismissed.

III.    New York Common Law Fraud

Bai brings as well a claim of common law fraud against the Defendants.  The claim is premised on the same conduct that supports his federal securities law claims.

The Defendants have moved to dismiss Bai's New York common law fraud claim.  They contend that Bai's action is untimely

under the New York statute of limitations for actions based upon fraud, and that in any event the TAC has failed to state a claim.[16]  The Defendants are correct that the claim is time-barred.

D.   Fraud in New York

A fraud claim under New York law consists of five elements: "(1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages."  Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 170 (2d Cir. 2015).  A cause of action for fraud may be based on an omission rather than an affirmative statement, but "only if the non-disclosing party has a duty to

---

[16] The Defendants urge the Court to decline to exercise supplemental jurisdiction over Bai's state law claim.  Bai urges the Court to exercise its supplemental jurisdiction over his state law claim since it shares a common nucleus of operative facts with his federal claims and because this is the fourth successive motion to dismiss these claims.

A district court may decline to exercise supplemental jurisdiction over a state law claim if it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Upon dismissal of all federal claims, a court must decide whether the traditional values of "economy, convenience, fairness, and comity" counsel against the exercise of supplemental jurisdiction.  Catzin v. Thank You & Good Luck Corp., 899 F.3d 77, 85 (2d Cir. 2018) (citation omitted).  Here, because judicial economy and convenience counsel strongly toward resolving Bai's fraud claim, supplemental jurisdiction is retained.

disclose." Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V., 68 F.3d 1478, 1483 (2d Cir. 1995).

As with federal securities fraud, the heightened pleading standard of Rule 9(b), Fed. R. Civ. P., applies to a state law claim sounding in fraud. See Loreley, 797 F.3d at 170. The complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." Id. at 171 (citation omitted). A strong inference of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004) (citation omitted).

E.   New York Statute of Limitations

Under New York law, an "action based upon fraud" must be commenced within "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it." N.Y. C.P.L.R. § 213(8); see also Monaco v. New York Univ. Med. Ctr., 623 N.Y.S.2d 566, 568 (1st Dep't

24

1995).  Under the two-year discovery rule, "the limitations period does not begin to run until the plaintiff has actual or inquiry notice of the injury."  Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 361 (2d Cir. 2013) (citation omitted).

Under the doctrine of inquiry notice, "[w]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, knowledge of the fraud will be imputed to him."  Boesky v. Levine, 147 N.Y.S.3d 2, 5 (1st Dep't 2021) (citation omitted).  The "duty to inquire is triggered by information that relates directly to the misrepresentations and omissions the [p]laintiffs later allege in their action against the defendants.  The triggering information need not detail every aspect of the subsequently alleged fraudulent scheme." S.A.C. Trading Corp., 711 F.3d at 361 (citation omitted). "[T]he court will impute knowledge of what a plaintiff in the exercise of reasonable diligence should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud."  Id. at 362 (citation omitted).

F.  Application to the TAC

Bai's fraud claim is untimely.  Pursuant to the fraud as alleged in the TAC, the Defendants wrongfully obtained $1

million from Bai in August 2013.  The cause of action for fraud
therefore accrued at that time.  Accordingly, the statute of
limitations began to run in August 2013 and expired in August
2019, eleven months before the filing of this action in June
2020.

The discovery rule does not toll a cause of action for the
fraud alleged in the TAC.  Bai has not adequately explained how
he only could have reasonably discovered the fraud after June of
2018, that is, during the two year period before he filed this
action.  At the very latest, a reasonably diligent investor had
a duty of inquiry as of September 8, 2015, when USCIS issued its
Notice of Intent to deny Bai's I-526 Petition for three reasons,
one of which was the existence of the Redemption Clause in the
investment documents.

Bai only briefly argues that his fraud claim is timely.  He
contends that he could not reasonably have discovered the fraud
until 2019, when he retained new counsel.  In support, he refers
to the "complex and devious nature of the fraudulent scheme" and
the fact that he had received "fake revenue payments from a non-
operable store from 2015 onward."  That he received
disbursements from his investment beginning in 2015 is not an
action that would have prevented a reasonable investor from
inquiring as to whether the Defendants had obtained his
investment in 2013 through false statements and material

omissions.   Again, the 2015 Notice of Intent put him on notice that he may never receive the visa he sought and that the inclusion of the Redemption Clause in the transaction documents was one of three reasons that USCIS was rejecting his application.[17]  As the discovery rule does not extend the statute of limitations on Bai's fraud claim, the claim is untimely and must be dismissed.

### Conclusion

The Defendants' July 22, 2021 motion to dismiss the TAC is granted.   The Clerk of Court shall enter judgment for the Defendants and close the action.

Dated:   New York, New York
         March 1, 2022

DENISE COTE
United States District Judge

---

[17] This determination regarding the statute of limitations makes it unnecessary to address whether the 2013 transaction documents also fully disclosed the relevant risks to Bai.